United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DFINITY FOUNDATION,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 22-cv-02632-CRB

**ORDER GRANTING MOTION TO DISMISS**

Plaintiff Dfinity Foundation ("Dfinity") alleges that Defendant Meta Platforms, Inc. ("Meta") infringed two of its trademarks, the Dfinity Mark and the Rainbow Mark (together, the "Dfinity Marks") by Meta's use of a new mark after its rebranding (the "Meta Mark").  See FAC (dkt. 29).  Meta moves to dismiss.  Mot. (dkt. 34).  As explained below, finding this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), the Court GRANTS Meta's motion to dismiss.

## I.    BACKGROUND

Dfinity alleges the following:

Dfinity is a nonprofit organization that runs the Internet Computer, a public blockchain network.  FAC ¶ 7.  Dfinity seeks to "provid[e] millions of developers and entrepreneurs with a public compute platform—creating a revolutionary new way to build websites, enterprise systems and internet services within an open environment."  Id. ¶ 8. In doing so, Dfinity "aims to take on Big Tech and its growing control over user data."  Id. From the Internet Computer's website, https://internet computer.org, users can download "dapps" (or decentralized applications) which allow users to design and develop software using the Internet Computer blockchain.  Id. ¶ 22.  The website also provides users with

United States District Court
Northern District of California

1  "educational tutorials and courses in the field of distributed computing platforms." <u>Id.</u> ¶

2  27.  To spread awareness of the Internet Computer and its uses, Dfinity sponsors

3  conferences and hackathons, and gives in-person and virtual presentations. <u>Id.</u> ¶¶ 30–33;

4  35–37.  In 2021, Dfinity announced its Developer Grant Program, a grant fund of $200

5  million "to support initiatives for developers to work on the Internet Computer." <u>Id.</u> ¶ 34.

6          In 2018, the USPTO granted registration of its first mark, the Dfinity Mark:



7

8

9

10  <u>Id.</u> ¶ 10.  Dfinity obtained registration of the Dfinity Mark for use in various computer-

11  based services, including: "Computer software for decentralized platforms, namely,

12  software for using a consensus engine incorporating blockchain technology for securing

13  data with cryptographic information"; "Design and development of computers and

14  software"; and "Hosting of digital content on the Internet, namely, computerized data,

15  files, applications and information." <u>Id.</u> ¶ 11.  Color was not claimed as a feature of the

16  mark. <u>Id.</u> ¶ 12.

17          In 2021, the USPTO granted registration of its second mark, the Rainbow Mark:



18

19

20

21  <u>Id.</u> ¶¶ 13, 15.  Unlike the Dfinity Mark, the colors purple, pink, blue, orange, and yellow

22  are claimed as a feature of the Rainbow Mark, and Dfinity's usage guidelines require that

23  these precise colors be used. <u>Id.</u> ¶¶ 16–17.

24          The Dfinity Marks have been "consistently used" on Dfinity's website since 2017.

25  <u>Id.</u> ¶ 18.  They are also displayed on search engines like Google, Dfinity's social media

26  pages, and on the websites of companies that have built tools using the Internet Computer.

27  <u>See, e.g.</u>, <u>id.</u> ¶¶ 38–39, 42.

28          On October 28, 2021, Facebook announced that it was rebranding as Meta, and

shared its new vision "to help bring the metaverse to life."  <u>Id.</u> ¶ 44.[1]  In his founder's letter introducing the rebrand, Mark Zuckerberg indicated that, pursuant to the company's new direction, it would work in tandem with other creators and developers in a more decentralized fashion: "The metaverse will not be created by one company.  It will be built by creators and developers making new experiences and digital items that are interoperable and unlock a massively larger creative economy than the one constrained by today's platforms and their policies."  <u>Id.</u>  Meta markets its services in part to creators and developers to design and build applications on Meta's VR platform.  <u>Id.</u> ¶¶ 62–63.

In 2022, Meta sought registration of the Meta Mark, described as "a geometric design consisting of two loops."  <u>Id.</u> ¶¶ 56–60.  The Meta Mark is not consigned to a single shape or color, and Meta employs it in a variety of ways, including on its website, social media channels, and products:





---

[1] https://about.fb.com/news/2021/10/founders-letter/. Because Zuckerberg's founder's letter is both extensively quoted in and linked in the complaint, <u>see</u> FAC ¶ 44 & n.13, it is incorporated by reference. <u>See, e.g.,</u> <u>Knoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 1002 (9th Cir. 2018).



Id. ¶¶ 47–51.  Dfinity also alleges uses of specific "multi-colored versions" of the Meta

Mark:



Id. ¶ 52.  After Meta unveiled its Meta Mark in October 2021, users replied to Dfinity's

Twitter account with comments on the similarities between the Dfinity Marks and the

United States District Court
Northern District of California

1  Meta Mark, and possibilities for partnerships or collaboration between the two entities.  Id.

2  ¶ 65.

3      In April 2022, Dfinity delivered a cease-and-desist letter to Meta demanding that it

4  halt use of the Meta Mark.  Id. ¶ 73.  Meta did not respond, and Dfinity filed this suit,

5  bringing four claims: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) false

6  designation of origin in violation of 15 U.S.C. § 1125(a); (3) common law unfair

7  competition; and (4) violation of California's Unfair Competition Law.  Id. ¶¶ 74–101.

8  Dfinity alleges that the similarities between the marks, coupled with the related services

9  and customer bases, will cause confusion because "consumers will mistakenly believe that

10  Meta and its services . . . are connected with, sponsored by, affiliated with, or related to

11  Dfinity and the Internet Computer."  Id. ¶ 64.

12      Meta then filed this motion to dismiss, as well as a request for judicial notice.  Mot.;

13  Request for Judicial Notice (dkt. 35).[2]

14  **II.    LEGAL STANDARD**

15      Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be

16  dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P.

17  12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory"

18  or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937

19  F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual

20  allegations depends on whether it pleads enough facts to "state a claim to relief that is

21  plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp.

22  v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads

23  factual content that allows the court to draw the reasonable inference that the defendant is

24  liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the

25

26  ───────────────

27  [2] Meta requests that the Court incorporate by reference nine exhibits and find that an additional twenty-four exhibits are judicially noticeable. Request for Judicial Notice at 7–11.  Because the Court need not take notice of all of these documents to decide this motion, the Court instead

28  considers Meta's request for judicial notice when it considers particular documents put forth by Meta in this order.

Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  However, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  To determine whether amendment would be futile, courts examine whether the complaint can be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296–97 (9th Cir. 1990).

## III.    DISCUSSION

### A.    Trademark Infringement and False Designation of Origin

To state either of its Lanham Act claims, Dfinity must allege facts that plausibly show: "(1) a protectable ownership interest in the mark; and (2) a likelihood of consumer confusion in defendant's use of its allegedly infringing mark." Lodestar Anstalt v. Bacardi & Co. Ltd., 31 F.4th 1228, 1245 (9th Cir. 2022) (internal quotation marks omitted).

Meta argues that Dfinity has failed to establish a protectable ownership interest in the Dfinity Mark, and that there is minimal likelihood of consumer confusion in its use of both the Rainbow Mark. Mot. at 11.  The Court agrees, and grants Meta's motion to dismiss as to both marks.

#### 1.    Protectable Ownership Interest in the Dfinity Mark

To establish a protectable ownership interest, "the party claiming ownership must

6

have been the first to actually use the mark in the sale of goods or services."[3] <u>Sengoku Works Ltd. v. RMC Int'l, Ltd.</u>, 96 F.3d 1217, 1219 (9th Cir. 1996).  Under Ninth Circuit law, "use in commerce" requires both "(1) an element of actual use, and (2) an element of display."  <u>Chance v. Pac–Tel Teletrac Inc.</u>, 242 F.3d 1151, 1159 (9th Cir. 2001).  The display must be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind."  <u>New W. Corp. v. NYM Co. of Cal., Inc.</u>, 595 F.2d 1194, 1200 (9th Cir. 1979) (quoting <u>New Eng. Duplicating Co. v. Mendes</u>, 190 F.2d 415, 418 (1st Cir. 1951)).

Meta argues that Dfinity has failed to plead "use in commerce" of the Dfinity Mark.[4]  In its motion, Meta contends that Dfinity has only alleged two facts regarding the Dfinity Mark: (1) that it has "consistently used its marks on its website since 2017," FAC ¶ 18; and (2) that both the Dfinity Mark and the Rainbow Mark are "valid, protectable marks that Dfinity has used in commerce since at least 2017."  <u>Id.</u> ¶ 77; <u>see also</u> Mot. at 12.  Meta argues that these allegations are too conclusory to plead use in commerce.  Mot. at 12–13.

Dfinity responds that it has "provided several examples of its use of the Dfinity Mark, beyond it being on its website since 2017."  Opp'n at 14.  Dfinity then lists these alleged uses of the Dfinity Mark: (1) in a July 2018 presentation on "The Future of Blockchain Networks, Tokens, & Registrations," FAC ¶ 31; (2) in a May 2019 presentation during New York Blockchain Week, <u>id.</u> ¶ 32; (3) in a March 2021 virtual event hosted by Dfinity, <u>id.</u> ¶ 33; (4) in May and June 2022, at "Supernova," the Internet Computer's inaugural hackathon, <u>id.</u> ¶ 35; and (5) at a conference hosted by the Stanford

---

[3] Dfinity seems to argue that because the registration of its marks gives it "prima facie evidence of [their] validity," that means it need not plead use in commerce to demonstrate a protectable ownership interest in an enforcement action.  15 U.S.C. § 1115(a); Opp'n at 12–13.  The Ninth Circuit does not agree.  <u>Lodestar</u>, 31 F.4th at 1248 ("[N]othing in the text of the Lanham Act suggests that its liberalization of the rules for obtaining <u>registration</u> of marks under the Madrid Protocol operates to override the settled foundational principle of trademark law that 'only use in the marketplace can establish a mark' and that registration alone 'does not create a mark or confer ownership' in a trademark." (quoting <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975, 979 (9th Cir. 2006)).

[4] Meta does not challenge Dfinity's ownership interest in the Rainbow Mark.  <u>See</u> Mot. at 11.

United States District Court
Northern District of California

1 Center for Blockchain Research, id. ¶ 37.

2       But Meta is correct when it points out that these are all uses of the Rainbow Mark,

3 not the Dfinity Mark.  Reply (dkt. 37) at 3.  During the July 2018 presentation, the

4 Rainbow Mark appears throughout the presentation, but not the Dfinity Mark.[5]  In the May

5 2019 presentation, the Rainbow Mark appears both on presentation slides as well as the

6 jacket and computer of the presenter, but the Dfinity Mark is nowhere to be found.[6]  The

7 same is true of the March 2021 virtual event, the Supernova hackathon, and the

8 presentation at the Stanford Center for Blockchain Research:[7] The Rainbow Mark is there

9 and often prominent, but the Dfinity Mark is absent.

10       Stripped of any allegations of use of the Dfinity Mark in any of the events described

11 above, the remaining allegations of its use are as limited as Meta contends: that Dfinity has

12 "consistently used its marks on its website since 2017" and that they are "valid, protectable

13 marks that Dfinity has used in commerce since at least 2017."  FAC ¶¶ 18, 77.  First, it is

14 not entirely clear whether "its marks" alleges that both marks have been used on its

15 website or if it has used either of them. A perusal of the website https://dfinity.org[8] reveals

16 only uses of the Rainbow Mark. Thus, the only remaining allegation supporting the Dfinity

17 Mark's use in commerce is the allegation that it is "used in commerce."  FAC ¶ 77.

18 Without any accompanying evidence in the complaint or incorporated by reference, this

19 allegation is too bare and conclusory to survive a motion to dismiss.  See, e.g., Beijing

20 Tong Reng Tang (USA), Corp. v. TRT USA Corp., 09-cv-882, 2010 WL 98957, at *2

21 (N.D. Cal. Jan. 5, 2010).

22       Meta's motion is thus granted with respect to the Dfinity Mark based on a failure to

23 plead use in commerce. The Court grants Dfinity leave to amend to plead use in commerce

24 of the Dfinity Mark. Leadsinger, 512 F.3d at 532.

25

26 [5] See FAC ¶ 31; https://www.youtube.com/watch?v=e8ZnW9J8N9s.
[6] See FAC ¶ 32; https://www.youtube.com/watch?v=xTID4zlgFVY.
27 [7] See FAC ¶¶ 33–37; https://www.youtube.com/watch?v=GXLf6rfzO9A;
https://www.youtube.com/watch?v=WVeovvm3znE.
28 [8] Because the website is linked in the complaint and described numerous times, see, e.g., FAC ¶¶
18–19, it is incorporated by reference.  Khoja, 899 F.3d at 1002.

**2.      Likelihood of Consumer Confusion: The <u>Sleekcraft</u> Factors**

To determine whether consumer confusion between the Rainbow Mark and the Meta Mark is likely, Ninth Circuit courts apply eight factors, derived from <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341 (9th Cir. 1979): (1) the similarity of the marks; (2) the strength of the mark allegedly infringed upon; (3) the proximity between the two entities' goods and services; (4) the likelihood that the infringer will expand into the infringee's market; (5) the degree of care likely to be exercised by purchasers of the services; (6) evidence of actual confusion in the marketplace; (7) the similarity of the marketing channels used; and (8) the infringer's intent in selecting the mark. <u>Brookfield Comm'cns, Inc. v. W. Coast Ent. Corp.</u>, 174 F.3d 1036, 1053–54 (9th Cir. 1999) (citing <u>Sleekcraft</u>, 599 F.2d at 348–49). The Ninth Circuit has cautioned that the Sleekcraft test is "pliant" and that "[s]ome factors are much more important than others, and the relative importance of each individual factor will be case-specific." <u>Id.</u> at 1054. While the first two factors—similarity of the marks and the goods and services offered by the two entities—"will always be important," a court may find likelihood of confusion by considering a subset of the factors, or additional factors not typically considered. <u>Id.</u> Courts "must be acutely aware of excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach." <u>Id.</u>

As explained below, because the Court finds that confusion between the Meta Mark and Dfinity's Rainbow Mark is unlikely as a matter of law, the Court grants Meta's motion as to the Rainbow Mark as well.

**a.      Similarity of the Marks**

The similarity of the marks is considered one of the most, if not the most, important factor when assessing likelihood of confusion. <u>Id</u>. A court must consider the "sight, sound, and meaning" of each mark, they "'must be considered in their entirety and as they appear in the marketplace,'" and "similarities [are] weighed more heavily than differences." <u>Id.</u> (quoting <u>Official Airline Guides, Inc. v. Goss</u>, 6 F.3d 1385, 1392 (9th Cir. 1993)). On a motion to dismiss, "[l]ikelihood of confusion can be determined . . . where the parties have

1   obviously dissimilar marks." <u>Mintz v. Subaru of Am., Inc.</u>, 716 F. App'x 618, 620 (9th

2   Cir. 2017).

3        We must first decide the version of the Meta Mark to which Dfinity's Rainbow

4   Mark must be compared. Dfinity argues that its logo must be compared to the below logo,

5   which is described in the FAC as one of the "multi-colored versions of" the Meta Mark:



9   FAC ¶ 52; Opp'n at 1, 20. As a source for this version of the Meta Mark, the FAC links to

10   an article called "Designing our new company brand: Meta" which describes the process

11   of creating the Meta Mark.[9] FAC at 23 n.19. The article includes photos and short videos

12   of the Meta logo in various stages of transformation, and states that the logo "can take on

13   infinite textures, colors and movement, capturing the creativity and imagination of a 3D

14   world." <u>Id.</u>

15        None of the photos on the page show the Meta Mark in the color and shape shown

16   by Dfinity in its complaint and opposition; rather, it appears that Dfinity's version of the

17   Meta Mark comes from a video showing the Meta Mark morphing into different colors,

18   textures, and shapes before ending on the blue, traditional Meta Mark.  Dfinity appears to

19   have taken a screenshot of the Meta Mark as it mutates in this video, timing the image to

20   precisely the split second in which it looks most like the Rainbow Mark.[10]  Dfinity has not

21   alleged that this "multi-colored version[]" of the Meta Mark appears anywhere else but in

---

[9] https://design.facebook.com/stories/designing-our-new-company-brand-meta/. The website is
linked in the complaint and described numerous times, <u>see, e.g.</u>, FAC ¶¶ 46–47, 52, and is thus
incorporated by reference. <u>Khoja</u>, 899 F.3d at 1002.

[10] Meta argues that not only is this a screenshot of the video, it is further manipulated by Dfinity:
"Apparently, Plaintiff took a screenshot of a 3D animated illustration within the Design Story,
converted it to a static image, <u>flattened and distorted it resemble a traditional infinity symbol</u>, and
now argues <u>that</u> logo infringes Plaintiff's rights." Reply at 1 (first emphasis added). While an
eyeball test does indicate that the split second of the video that Dfinity has captured appears to be
more akin in shape to the traditional blue Meta logo that ends the video than the screenshot that
appears in Dfinity's complaint and opposition, the Court need not, and does not, find that the
screenshot was further altered by Dfinity.

the video in this article.

Meta argues that the Meta Mark alleged by Dfinity is an improper comparator because it was never used as a trademark nor in a commercial transaction; and the split-second appearance of the version of the mark Dfinity seizes upon is "ephemeral," and thus cannot "constitute use 'that confuses the public about the actual source of goods and services.'"  Reply at 6 (quoting <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672, 677 (9th Cir. 2005)).  Meta argues that the proper comparator is the version that it has registered as a trademark and that appears on its webpages and products:



The Court agrees. Even assuming the design story is a commercial use of Meta's trademark—describing the company's brand evolution from Facebook to Meta and thus related to the goods and services the new brand seeks to market and sell—the use of the screenshotted multi-colored mark is so fleeting that it cannot be a source of customer confusion.  See, e.g., <u>Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC</u>, 331 F. Supp. 3d 1131, 1149 (D. Idaho 2018) (finding that use of marks in very small print at the bottom of a product information sheet is unlikely to give rise to confusion among sophisticated customers), <u>aff'd</u>, 775 F. App'x 350 (9th Cir. 2019).  Because Dfinity has failed to allege any other situation in which the screenshotted mark is used, the Court compares the Rainbow Mark to the traditional Meta Mark, as it is found in numerous paragraphs of the complaint, on numerous webpages, on Meta's products, and in Meta's trademark filings.  <u>See</u> <u>FAC</u> ¶¶ 48–51, 62–63, Exs. C–G.  Thus, the proper comparison is between the following marks, with Dfinity's Rainbow Mark on the left and the Meta Mark on the right:[11]

---

[11] Because Court finds that Dfinity fails to allege use in commerce of the Dfinity Mark, as explained above, the Court does not include the Dfinity Mark in this comparison.  Nevertheless, the Dfinity Mark is even less similar to the Meta Mark than the Rainbow Mark is.

 

Employing the "sight, sound, and meaning" test, the marks are dissimilar: Dfinity's shape is a traditional infinity sign, with the lines crossing at the horizontal and vertical midpoint, and a precise multicolor format that Dfinity instructs users of the logo not to alter.  See FAC ¶¶ 16–17.  While Meta's logo can and does appear in different colors, and is not always in the traditional blue, see, e.g., FAC ¶¶ 50–51, its shape is still dissimilar to Dfinity's: While it includes two loops and bears some resemblance to an infinity sign, the lines cross above the vertical midpoint and the two loops are squished into vertical oblong shapes; Meta compares its logo to the letter "M" for Meta, or a video game controller.[12] Mot. at 7.  The marks are even more dissimilar when they are accompanied by the parties' names, which happens often (though not always) in commercial settings.  Compare FAC ¶ 18 (Rainbow Mark on Dfinity's website next to the word "Dfinity"), and FAC ¶ 48 (Meta Mark on its "About Meta" webpage), with FAC ¶ 42 (Rainbow Mark appearing without the word "Dfinity" on CrowdEats), and FAC ¶ 51 (Meta Mark appearing without the word "Meta" on its virtual reality system). The thickness of the lines and the general continuous pattern of two loops intersecting at a midpoint are the only aspects that render these two marks similar.

But dismissal based on this factor alone requires not just that the logos are dissimilar; the question is whether they are "obviously" dissimilar, or "so facially dissimilar that they cannot possibly create a likelihood of confusion." Mintz, 716 F. App'x at 621.  In cases in which courts in this Circuit have decided motions to dismiss on this factor alone, words have often been an aspect of the trademark, with the words being clearly different.  See, e.g., Mintz, 716 F. App'x at 620–21 (comparing "Share the Love"

---

[12] One might also compare it to the traditional shape of a soft pretzel.

to "A World of Love, for You and Those You Love"); <u>Murray v. Cable Nat'l Broad. Co.</u>, 86 F.3d 858, 861 (9th Cir. 1996) (comparing "America Speaks" to "America's Talking"); <u>Knowles v. Spin Master, Inc.</u>, 18-cv-5827, 2018 WL 6131207, at *4 (C.D. Cal. Nov. 2, 2018) (comparing "Rusty Rivets" to "Rivets & Ruby") <u>Marvel Enters., Inc. v. NCSoft Corp.</u>, 04-cv-9253, 2005 WL 878090, at *4 (C.D. Cal. Mar. 9, 2005) (comparing "Statesman" to "Captain America").  Because, as explained above, both parties occasionally use the marks without their names attached, words are not dispositive here. And while Meta is correct that <u>Mintz</u> involved a design as well, the designs in <u>Mintz</u> were far more facially dissimilar than those at issue here.  <u>Mintz</u>, 716 F. App'x at 621 (where one design "include[d] a hand that is circumscribed by a heart and includes an entire body" while the other "depict[ed] [only] a hand with a heart on it" that "radiate[d] blue beams").

Therefore, the Court analyzes the rest of the <u>Sleekcraft</u> factors and declines to dismiss Dfinity's claim based on the first <u>Sleekcraft</u> factor alone.

### b.      Strength of the Rainbow Mark

The scope of trademark protection afforded to a mark depends on its strength.  <u>See Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002).  "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting <u>Brookfield</u>, 174 F.3d at 1058).  To determine strength, courts consider both "conceptual strength"—whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic—and "commercial strength"—whether and to what extent a mark is actually recognizable in the marketplace.  <u>Id.</u>  Commercial strength may be shown by advertising expenditures, length of exclusive use, public recognition, and uniqueness. <u>Id.</u>

Dfinity argues that because its marks are suggestive and registered, it is accorded greater protection under the "conceptual strength" prong of the test.  Opp'n at 17.  Meta argues that such suggestive marks are "presumptively weak," <u>Brookfield</u>, 174 F.3d at 1058, and in any case, even weaker "in light of the very crowded field they occupy."  Mot.

at 17.  Meta contends that because there are "<u>fifteen hundred</u> other registered trademarks comprising an infinity symbol for the same classes of goods and services as Plaintiff's," the Rainbow Mark is indistinctive in such a "crowded field."[13]  <u>Id.</u>

On a motion to dismiss, the Court does not find that Dfinity's marks are weak on the evidence proffered by Meta.  While it is not surprising that there are many registered trademarks for marks resembling the infinity sign in the field occupied by Dfinity, Meta does not demonstrate how recognizable those marks are in comparison to Dfinity's.  <u>See</u> <u>Zobmondo Ent., LLC v. Falls Media, LLC</u>, 602 F.3d 1108, 1119 (9th Cir. 2010) (finding that evidence of third-party use of the mark, "without contextual information such as sales figures and distribution locations," does not demonstrate "long-standing customer understanding").  It is certainly possible that Dfinity is the most recognizable infinity sign in its class, in which case even a suggestive mark in a "crowded field" could be stronger than expected.  <u>Cf.</u> <u>Network Automation</u>, 638 F.3d at 1149 (citing <u>Brookfield</u>, 174 F.3d at 1058).  Discovery would explore such a possibility.

Similarly, the Court finds Meta's conclusory arguments regarding commercial strength to be equally unpersuasive.  Contrary to Meta's arguments, Dfinity pleads facts that show <u>some</u> measure of commercial recognition, which is all that is required on a motion to dismiss.  FAC ¶¶ 18–19, 30–43; <u>Vapor Spot, LLC v. Breathe Vape Spot, Inc.</u>, 15-cv-2110, 2015 WL 12839123, at *8–9 (C.D. Cal. Sept. 15, 2015).  It would be improper for the Court to take these pleadings and find that they establish minimal commercial strength under the <u>Sleekcraft</u> test.  <u>Cf.</u> <u>Solid 21, Inc. v. Breitling USA, Inc.</u>, 512 F. App'x 685, 687 (9th Cir. 2013) ("[T]he inquiry under Rule 12(b)(6) is into the adequacy of the pleadings, not the adequacy of the evidence.").

On this record, other than acknowledging the Ninth Circuit's description of suggestive marks like the Rainbow Mark as "presumptively weak," <u>Brookfield</u>, 174 F.3d

---

[13] The Court takes judicial notice of the PTO registrations of the other infinity signs identified by Meta. Request for Judicial Notice Ex. 16–24; <u>see also, e.g.</u>, <u>Autodesk, Inc. v. Dassault Systemes Solidworks Corp.</u>, 08-cv-4397, 2008 WL 6742224, at *2 n.1 (N.D. Cal. Dec. 18, 2008).

United States District Court
Northern District of California

at 1058, the Court finds that the Rainbow Mark is neither particularly weak nor particularly strong, and that this factor is accorded little weight in the balance of the Sleekcraft factors at this stage.

### c.  Proximity between the Parties' Goods and Services and Likelihood of Expansion

These two Sleekcraft factors measure the proximity between the two entities' goods and services and the likelihood of the defendant's expansion into related goods and services, because "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." Brookfield, 174 F.3d at 1055–56. The parties need not provide the same services, nor be direct competitors; courts must focus on the infringee's customers and "ask whether they are likely to associate" its products with the infringer's. Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1998). But where the services are "totally unrelated," dismissal is appropriate. Ketab Corp. v. Mesriani & Assocs., P.C., 734 F. App'x 401, 406 (9th Cir. 2018).

It cannot be said that the services are "totally unrelated" such that this factor is dispositive on a motion to dismiss. Dfinity's main service is the Internet Computer, "a public, blockchain network powered by 'chain key cryptography.'" FAC ¶ 7. This system aims to "provid[e] millions of developers and entrepreneurs with a public compute platform" with the long-term aim of "creating a revolutionary new way to build websites, enterprise systems and internet services within an open environment." Id. ¶ 8. Dfinity provides downloadable software to developers, as well as educational services like tutorials on its website. Id. ¶¶ 19, 27. Dfinity also hosts conferences to discuss its work with the larger tech community. Id. ¶¶ 19, 30.

Meta's core products are its Facebook and Instagram applications and its virtual reality system, Meta Quest. Id. ¶ 51. While Meta does not now provide the precise services that Dfinity does, it does provide developers and creators with the ability to design, build, and launch VR apps on Meta Quest. Id. ¶ 63. While this process still

15

appears to run on the kind of "centralized, closed system" that exemplifies "Big Tech," there are indications that the kind of work Dfinity and its developers do may soon be at least complementary to Meta's work and overall mission.  Id. ¶¶ 8, 44.  As Mark Zuckerberg's founder's letter launching Meta explains: "The metaverse will not be created by one company. It will be built by creators and developers making new experiences and digital items that are interoperable and unlock a massively larger creative economy than the one constrained by today's platforms and their policies."  Id. ¶ 44.  It seems plausible that Zuckerberg is describing products and services like Dfinity's Internet Computer.

Meta argues that this case is akin to Murray v. Cable Nat'l Broadcasting Co., in which the Ninth Circuit found that the services provided by Murray's "man-on-the-street" consumer surveys—"America Speaks"—were unrelated to those provided by CNBC's "America's Talking," where CNBC polled viewers by having them call telephone numbers. 86 F.3d at 861.  The Court finds this case more akin, at this stage, to Dreamwerks Production Group v. SKG Studio, 142 F.3d 1127 (9th Cir. 1998).  In Dreamwerks, an organizer of Star Trek conventions, the senior user of the "Dreamwerks" mark and a much smaller company, sued DreamWorks, an emerging and powerful film studio.  142 F.3d at 1128.  While the district court dismissed because the companies' missions and targeted audience were different—"Dreamwerks targets trekkies; DreamWorks targets everyone"—the Ninth Circuit reversed: "[T]he relatedness of each company's prime directive isn't relevant. Rather, we must focus on Dreamwerks' customers and ask whether they are likely to associate the conventions with DreamWorks the studio."  Id. at 1131.  The Ninth Circuit found that because "[e]ntertainment studios control all sorts of related industries," the notion that Star Trek conventions and a movie studio could be related goods was not at all beyond that court's imagination. Id.

Meta is in a similar bind: Dfinity targets developers interested in using the blockchain to "build websites, enterprise systems and internet services within an open environment."  FAC ¶ 8.  Meta targets everyone, including developers, some of whom presumably are interested in building their products within, or at least compatible with,

16

such an "open environment."  Meta argues that its products are antithetical to that vision, and there is no indication that it is interested in expanding into the realm occupied by Dfinity and the Internet Computer.  Mot. at 20–21.  But given Meta's metamorphosis over the last few years, such a move is not implausible on the pleadings, particularly in light of Zuckerberg's statement at the launch of the Meta brand.  FAC ¶ 44.

Because it cannot be said that the parties' services are "totally unrelated" at this stage, nor is it implausible that Meta may expand its business to compete with Dfinity, the question then becomes: Are Dfinity's customers likely to associate its products with Meta and thus be confused?  See Dreamwerks, 142 F.3d at 1131.

### d.    Type of Goods and Degree of Care

Courts assess this factor based on "the typical buyer exercising ordinary caution," though "[w]hen the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." Sleekcraft, 599 F.2d at 353. "Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items." Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1076 (9th Cir. 2006) (emphasis added).  In Network Automation, the Ninth Circuit held that a district court improperly concluded that "Internet users on the whole exercise a low degree of care," because they "suspect that there are many contexts in which [that] no longer holds true." 638 F.3d at 1153.

This is almost certainly one of those contexts.  If web purchasers, particularly purchasers of sophisticated items, exercise a higher degree of precision in their dealings with and understanding of the internet, the developers to which Dfinity markets its software are perhaps multitudes more sophisticated and exercise a correspondingly higher degree of care.[14]  See, e.g., Oculu, LLC v. Oculus VR, Inc., 14-cv-196, 2015 WL 3619204,

---

[14] Dfinity's argument that because its services are offered "for little or no cost," consumers are less likely to exercise care, is unpersuasive.  Opp'n at 22 (citing Discovery Comm'cns, Inc. v. Animal Planet, Inc., 172 F. Supp. 2d 1282, 1290 (C.D. Cal. 2001)).  These are not "pet-related products and services," as in Animal Planet, but software offered to developers.  Id.  A service can be both low-cost and sophisticated, and a tech-savvy consumer is not likely to exercise less care if the service is sophisticated, simply because it is also inexpensive.

at \*16 (C.D. Cal. June 8, 2015) ("Defendant's current customers are tech-savvy developers who are designing VR video games, apps, and experiences for retail end users. It is unlikely that these types of sophisticated purchasers will confuse Plaintiff's services with Defendant's goods and services.").

Dfinity's customers are "tech-savvy developers" who understand how to harness the Internet Computer for their own projects and businesses, or who seek to learn to do so. Opp'n at 22; see also, e.g., FAC ¶¶ 8, 29.  For example, Dfinity has awarded grants to "promising developers and teams" to build tools from a "decentralized tokenized asset management platform" to a "decentralized email that integrates NFTs and distributed storage."[15] FAC ¶ 34. Dfinity's customers may have participated in its hackathon, used or reviewed its sponsored research at Stanford, or attended its conferences or lectures.  See FAC ¶¶ 31–37.  That these sophisticated people, immersed in the intricacies of the tech world, would be duped by a logo, particularly one that is not similar in key respects, see supra Section III.2.a, borders on implausible.[16]

### e.    Instances of Actual Confusion

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."  Playboy Enters. V. Netscape Comm'cns Corp., 354 F.3d 1020, 1026 (9th Cir. 2004).  While evidence of actual confusion is not necessary, particularly at early stages, see Network Automation, 638 F.3d at 1151, the lack of evidence of actual confusion where the marks have co-existed for a significant period of time weighs against a finding of likelihood of confusion.  Oculu, 2015 WL 3619204, at \*13.

Dfinity proffers six Twitter replies as evidence of actual confusion.  FAC ¶ 65.

---

[15] https://dfinity.org/grants. The website is linked in the complaint and thoroughly described, see FAC ¶ 34, and is thus incorporated by reference. Khoja, 899 F.3d at 1002.
[16] Another comparison to Dreamwerks is apt here. The Ninth Circuit instructs courts to "focus on Dreamwerks' customers and ask whether they are likely to associate [Dreamwerks'] conventions with DreamWorks the studio." 142 F.3d at 1131 (emphasis added). It is indeed reasonable that lay science fiction fans might associate a convention with the same name as a film studio with that film studio. It is not so reasonable to think that Dfinity's sophisticated customers would associate it with Meta, a company with a different name and a dissimilar logo.

These tweets all appear to reply to a tweet from Dfinity itself, although neither the text of the original tweet, nor any link to the original tweet, was provided in the complaint.[17] <u>Id.</u> The replies either state that the marks resemble each other ("Too similar," "meta is copying icp's logo or something,") or that the marks' similarity indicates a partnership between Meta and Dfinity ("Meta+InternetComputer = …?" "Partnership?" "I see a partnership? Kismet?"). <u>Id.</u>

First, the fact that these statements appear to reply to a tweet from Dfinity itself (regardless of what it said) indicate that they do not represent the natural confusion of a consumer; these replies are derived from some prompting from Dfinity itself rather than experiencing the marks organically as consumers in the marketplace. <u>Contra, e.g.</u>, <u>Kreation Juicery, Inc. v. Shekarchi</u>, 14-cv-658, 2014 WL 7564679, at *7 (C.D. Cal. Sept. 17, 2014) (finding, as one piece of evidence of actual confusion, that customers placed orders with the wrong restaurant and went to pick them up at their competitor). Second, as Meta argues, these replies indicate a clear understanding that Meta and Dfinity represent different entities, and Dfinity's original tweet prompted the connection and discussion of similarities between the marks or possible partnerships. <u>See, e.g.</u>, <u>Aurora World, Inc. v. Ty Inc.</u>, 719 F. Supp. 2d 1115, 1123–24, 1160–61 (C.D. Cal. 2009) (finding that emails discussing the competitor's toys as a "[t]otal rip off" and "exact copies" of the plaintiff's toys did not represent evidence of actual confusion because the authors "understand that there are at least two different plush toy manufacturers"). It thus cannot be said that these tweets evidence actual confusion.

### f.    Similarity of Marketing Channels

Having found that the parties' services are not "totally unrelated" at this stage, the Court also finds that the parties' marketing channels are similar, but that this factor does

---

[17] Meta, in its request for judicial notice, provides what it alleges to be the original tweet that prompted the replies in Dfinity's complaint. Request for Judicial Notice at 4; <u>see id.</u> Ex. 9. Though the original tweet can be incorporated by reference, <u>Foy v. Vinson</u>, 21-cv-2076, 2022 WL 1443761, at *1 (D. Ariz. May 6, 2022), because the complaint does not provide the link to the original tweet, the Court does not make any determination as to whether the tweet provided by Meta is in fact the tweet that prompted the replies in the complaint.

United States District Court
Northern District of California

not weigh as heavily as the others previously discussed.

It is true, of course, that the complaint indicates that both parties' market to their developer customer base via the Internet, including their own websites and social media. See, e.g., FAC ¶¶ 18, 38, 48–49.  It is also true that the Ninth Circuit ascribes little weight to this fact, given the ubiquity of marketing through websites and social media channels. Cf. Network Automation, 638 F.3d at 1151.

Therefore, while this factor weighs in favor of confusion, it is not accorded significant weight.

### g.   Defendant's Intent

Finally, because the Court finds that the mark is dissimilar (though not "obviously" so), see supra Section III.2.a, and because Dfinity does not allege evidence of bad faith beyond a general allegation of "willful and wonton disregard of Dfinity's established and superior rights" in its trademark, FAC ¶ 68, the Court finds that this factor weighs against finding a likelihood of confusion.  See Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1081 (9th Cir. 2020).

### 3.   Weighing the Factors

When weighing the Sleekcraft factors, the Ninth Circuit has repeatedly instructed that courts should not apply them mechanically.  Entrepreneur Media, 279 F.3d at 1141. Some factors—"such as the similarity of the marks and whether the two companies are direct competitors"—are always important to the analysis.  Brookfield, 174 F.3d at 1054. It is also possible to reach a conclusion by considering only a few factors. See, e.g., Dreamwerks, 142 F.3d at 1130–32.  Rather, courts consider "what the analysis as a whole reveals about the ultimate question before us: the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark."  Entrepreneur Media, 279 F.3d at 1141.

Considering the analysis as a whole, the Court finds that three factors should be more heavily weighted than the rest: (1) the similarity of the marks; (2) the relatedness of the goods; and (3) the type of goods and degree of care.  Dreamwerks, a useful guide,

United States District Court
Northern District of California

similarly weighed three factors: The strength of the mark; the similarity of the marks; and the relatedness of the goods.  Dreamwerks, 142 F.3d at 1130.  Because there is little evidence of the mark's strength or weakness at this stage of the proceedings, see supra Section III.2.b, the Court finds that the type of goods should be more heavily weighted in this context.  The customer base in Dreamwerks consisted of lay consumers of entertainment; the customer base in this case is "tech-savvy developers."  Opp'n at 22.  With so sophisticated a product and a customer base, the type of good and the degree of care should be given more weight in this analysis than in the usual trademark infringement case, where laypeople are often the prospective customers.

The Court finds that the dissimilarity between the marks and the sophistication of the good itself and Dfinity's customer base militate toward a finding that customer confusion is implausible based on the operative complaint.  The marks differ significantly in shape; they are not facially similar, though not so obviously dissimilar as to dismiss on that basis alone.  However, coupled with Dfinity's prospective customer, who is looking to build applications and software using Dfinity's technology, it is implausible that such a customer would look at these dissimilar marks and be actually confused between Dfinity's and Meta's products.  And while the goods and marketing channels are similar in certain ways—the parties do market to developers to build and create based on the parties' software, in Dfinity's case the Internet Computer, and in Meta's its VR system, Meta Quest—it is highly unlikely that these sophisticated developers cannot tell the two entities apart, even in light of those similarities.  Though Dfinity is not required to present evidence of actual confusion, the evidence Dfinity does provide does not indicate actual confusion, see supra Section III.2.e, and thus does not alter this conclusion.

As a result, the Court finds that Dfinity has not alleged a likelihood of consumer confusion on its trademark infringement and false designation of origin claims, and grants Meta's motion to dismiss as to those claims.  Because Dfinity could allege facts that alter this analysis, the Court grants Dfinity leave to amend to plead additional facts that demonstrate the following: (1) the sophistication (or lack thereof) of Dfinity's customer

base, and the degree of care it employs when choosing to build using Dfinity's software and tools; and (2) any other evidence of actual confusion among Dfinity's customers to render plausible the allegation that such a customer is likely to be confused between Dfinity's Marks and the Meta Mark.  <u>Leadsinger</u>, 512 F.3d at 532.

### B.   State-Law Claims

The parties agree, as does the Ninth Circuit, that Dfinity's state-law and common-law unfair competition claims rise and fall on its Lanham Act claims.  <u>See</u> <u>Cleary v. News Corp.</u>, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (stating that UCL and common-law unfair competition claims are "substantially congruent" to Lanham Act claims).  Thus, Meta's motion to dismiss is granted on these claims as well.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Meta's motion to dismiss with leave to amend. Dfinity may file an amended complaint within 21 days of this order.

**IT IS SO ORDERED.**

Dated: November 10, 2022



CHARLES R. BREYER
United States District Judge